UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-------------------------------------------------------------------X

JAHQUAN SPENCER (individually),
BERNADINE COOLEY (individually),
S.S. (a Minor by), Z.S1 (a Minor by),
Z.S2 (a Minor by) JAHQUAN SPENCER
and BERNADINE COOLEY
(their natural guardian parents)

**FILED**
**CLERK**

10:56 am, Aug 06, 2024

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

                              Plaintiffs,

            -against-

**MEMORANDUM AND ORDER**
20-CV-03747 (JMA) (ARL)

OMEGA LABORATORIES INC., BILL CORI,
PATRICK MINNO, DAVID ENGELHART,
JESSICA WEIGEL and CHRIS SCHMIDT

                              Defendants.

-------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Plaintiffs Jahquan Spencer ("Spencer"), Bernadine Cooley ("Cooley") (together, the "Parents"), along with their Minor children S.S, Z.S1, and Z.S2 (collectively, with the Parents, "Plaintiffs") commenced this diversity action on August 14, 2020. The defendants in this case are Omega Laboratories, Inc. ("Omega"); Bill Cori, CEO of Omega; David Engelhart, Omega's Laboratory Director; Patrick Minno, an Omega Supervisor, and Omega employees Jessica Weigel and Chris Schmidt (together, the "Defendants"). Plaintiffs' First Amended Complaint ("FAC") asserts state law claims for fraud, fraudulent concealment, negligence, and negligent infliction of emotional distress stemming from multiple drug tests performed by Omega which reported that the Parents were positive for cocaine use. (FAC, ECF No. 24.) Before the Court is Defendants' motion to dismiss the FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defs.' Mot. to Dismiss, ECF No. 41.) For the reasons discussed below, the Court grants Defendants' motion and dismisses Plaintiffs' FAC for failure to state a claim for which relief may be granted.

1

## I. BACKGROUND

### A. Factual Background

### 1. Overview

The following facts are taken from the FAC and the exhibits which are attached or integral to that pleading.  See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).  The FAC is 55 pages long and includes more than 375 pages of exhibits.[1]

This is one of five cases that Plaintiffs have brought against various entities related to the numerous drug tests they took in connection with child abuse proceedings that were brought against the Parents in Suffolk County Family Court.

The FAC and a complaint filed by Spencer in a related case before this Court against a different testing laboratory indicate that Cooley tested positive for cocaine on two separate hair tests—in November 2017 and July 2018—and that Spencer tested positive for cocaine on four hair tests—in November 2017, in August 2018, and twice in September 2018.[2]  Additionally, Plaintiffs'

---

[1] Plaintiffs' original complaint was 89 pages long and included more than 500 pages of exhibits.  (Compl., ECF No. 1.)

[2] Plaintiffs have filed at least four related cases in federal and state courts.  In addition to taking court-ordered and private hair tests performed by Omega, Spencer also paid for a private hair test through a different testing laboratory on August 28, 2018.  Spencer has filed suits in state and federal court asserting negligence and fraud claims against various parties involved in the August 28 hair test, including Laboratory Corporation of America ("LabCorp").  Spencer's suit against LabCorp is pending before the undersigned (the "LabCorp Case").  Spencer v. Laboratory Corp. of America Holdings, No. 19-CV-04927-JMA (E.D.N.Y.); see Second Amended Complaint ("LabCorp Complaint"), Spencer v. Laboratory Corp. of America Holdings, No. 19-CV-04927-JMA (E.D.N.Y.) (ECF No. 60).)

    The allegations in the LabCorp Complaint and the pleadings filed by Plaintiffs in other related cases constitute admissions of which the Court can take judicial notice and can consider here.  See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (taking judicial notice of guilty plea and noting that "[t]he most frequent use of judicial notice of ascertainable facts is in noticing the content of court records.") (quoting 21 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5106 at 505 (1977)); In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig., No. 305-MD-527, 2010 WL 1253891, at *1 (N.D. Ind. Mar. 29, 2010) (stating that "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took certain position, and that certain ... admissions were made" and taking judicial notice of admission defendant made in court filing) (emphasis added); Flint v. Beneficial Fin. I Inc., No. 12-CV-01675, 2012 WL 3277109, at *3 (E.D. Cal. Aug. 9, 2012) (taking judicial notice of admission by plaintiff in pleading filed in another case).  Moreover, even if the Court were to not consider

opposition brief indicates that, on November 22, 2017, one of the Parents' minor children tested positive for cocaine.

The Parents nevertheless insist that they do not use any drugs and allege that each of their positive hair tests were false positives and were fraudulent, tampered with, and/or negligently administered in some fashion.  (FAC ¶¶ 25, 81, 82.)  In addition to their insistence that they do not use drugs, the FAC alleges that the Parents took urine tests that were negative for cocaine and that Cooley took a hair test in August 2018 that was also "negative" for cocaine.  Plaintiffs also point to, among other things, various alleged discrepancies in the testing documentation that they have submitted as attachments to the FAC, including copies of the Custody and Control Forms ("CCF") that are used to document the chain of custody for drug testing samples.

**2.    Child Abuse Proceeding and the Parents' Court-Ordered Drug Tests in November 2017 and July 2018**

Between approximately November 2017 and July 2019, the Parents were involved in a child abuse proceeding in Suffolk County Family Court ("Family Court").  (FAC ¶¶ 10, 55.)  On November 27, 2017, the Family Court issued an order for the temporary removal of S.S. and Z.S1 from the Parents' custody and ordered the Parents to submit to hair and urine drug tests.[3]  (Id. ¶¶ 10, 12.)  That same day, the EAC Network, TASC ("EAC"), which was acting on behalf of the Suffolk County Child Protective Services ("SCCPS"), collected Cooley's head hair sample and Spencer's body hair sample for testing.  (Id. ¶ 13.)  EAC allegedly then sent those hair specimens to Omega, which was to perform the actual tests on the samples.  (Id. ¶ 13.)  On November 27,

_____

these other pleadings filed by Spencer, the Court would still find, based on the FAC alone, that Plaintiffs have not alleged any plausible claims here.

[3] Plaintiffs' opposition brief explains that their state court suit against Suffolk County concerns a November 22, 2017 drug test that prompted the temporary removal of the children.  One of the minor children tested positive for cocaine.  (Pls.' Opp'n Br. at 1, ECF No. 41-2.)  The Parents maintain that they do not know how this could have occurred because: (1) they do not use drugs; and (2) this child was "with an aunt in a living section of . . . . plaintiff's home" when this occurred, and the aunt informed the Parents that she also does not use drugs.  (Id.)

EAC also collected and tested the Parents' urine samples.  (Id.)  The urine tests for both parents came back negative.  However, on December 6, 2017, Omega reported to EAC that both parents' hair specimens were positive for cocaine—Cooley's head hair sample tested positive within a 90-day interval and Spencer's body hair sample tested positive within a 12-month interval.  (Id. ¶¶ 15, 163.)

Spencer signed and dated the CCF for his November 2017 hair test.  The CCF, however, fails to list the time of day the sample was collected.  (Id. ¶ 163; see Compl., Ex. 3 (CCF for Spencer's November 2017 hair sample).)  Gregory Kelly, the EAC employee who collected Spencer's hair sample, was responsible for inputting that information.  (Id. ¶ 163; see Compl., Ex. 3.)  The FAC does not allege that Cooley's CCF for her November 2017 test contains any irregularities or omissions.  (See also Compl. Ex. 3 (copy of CCF for Cooley's November 2017 hair test).)

After the removal of the children, Cooley enrolled in a court-ordered drug program and graduated early from the program on July 9, 2018.  (FAC ¶ 19.)  The FAC alleges that Cooley "tested negative on every drug test throughout" this program, but does not allege that these negative drug tests involved hair testing.  (Id.)

On July 10, 2018, during a permanency hearing in Family Court, Cooley requested unsupervised visitation with her children.[4]  (Id. ¶ 20.)  SCCPS asked the Family Court to reserve judgment until Cooley submitted a second hair test and the permanency hearing was adjourned to March 6, 2019.  (Id. ¶ 20.)

---

[4] In an October 9, 2018 letter that Cooley sent to EAC, Cooley mentions the fact that a "trial was held" where an EAC employee testified about the Parents' November 2017 drug tests.  (FAC, Ex B at1.)  The FAC says nothing further about this trial or what this EAC employee testified about.

The FAC alleges that, on July 11, 2018, EAC collected Cooley's hair specimen and informed her that it would be shipped to Omega, which would perform the testing.  (Id. ¶ 21.)  As explained further below, Omega would eventually report, on August 14, 2018, that Cooley had again tested  positive for cocaine.  (Id. ¶¶ 24, 26; id., Ex. A.)

On August 28, 2018, at a fact-finding hearing, the Family Court informed Cooley of this positive test result and found, based on the positive drug tests, that the Parents had neglected and abused their children.  (Id. ¶ 24, 26.)  Cooley claims that she was shocked because "she does not and did not use cocaine."  (Id. ¶ 25.)

The Parents allege that their November 2017 drug tests and Cooley's July 2018 drug test were false positives and that the reported positive results are invalid and fraudulent because they do not use drugs, as evidenced by both their negative urine tests and a "negative" hair test that Cooley underwent in August 2018, which is discussed further below.  Plaintiffs also maintain that the validity of Cooley's July 2018 hair follicle test result is undermined by: (1) alleged errors and inconsistencies on Omega's August 14 report and an EAC memorandum to the Family Court concerning the collection date for this test;[5] (2) Omega's delay in reporting the test result—which normally has a turnaround of 2–3 days—and the purportedly conflicting explanations Plaintiffs received from EAC and Omega about the reasons for the delay; and (3) the Parents' alleged inability to obtain litigation packages for the July 2018 test or the November 2017 tests.

### 3.  Cooley's August 2018 Hair Test

While Cooley was waiting for the results of her July 2018 hair test, she paid for a private hair test through Rabu Diagnostic Services ("Rabu").  (FAC ¶ 22.)  Cooley's hair sample for this

---

[5] This August 14 report states that Cooley's sample was collected on July 12, which Plaintiffs allege is incorrect because, according to the FAC, Cooley's sample was collected on July 11.  On August 14, EAC also sent a memorandum to the Family Court about this positive test result which erroneously states that Cooley's test was "taken" on July 10.

test was collected by Rabu on August 17, 2018.  (Id.)  This sample was then sent to Omega for testing and Omega issued a one-page report on August 22, 2018, which states that this test was "negative" for all substances, including cocaine.  (FAC ¶ 23.)  Omega's August 22 report states that a "negative result" indicates that cocaine was not "detected at a concentration equal to or greater than" the "listed cutoff level" of 500 pg/mg.  (FAC, Ex. E.)

As explained infra, in November 2018, Omega would send the Parents a "litigation package" that contains extensive documentation for Cooley's August 2018 hair test.  The litigation package indicates that Cooley's sample hair tested "positive" for cocaine on an initial screening test.  (Id.) A subsequent confirmatory screening found a cocaine level of 275 pg/mg in this hair sample, which was then reported as "negative" on Omega's August 22 report because it was below the 500 pg/mg "cutoff" level.  (Id.)

### 4.  Spencer's Additional Hair Tests in August and September 2018

In late August 2018 and September 2018, Spencer paid for three private hair tests.  One of these tests was through LabCorp; the other two test were performed by Omega.  All three of these additional private hair tests were reported as positive for cocaine.  As with the November 2017 and July 2018 hair tests, Plaintiffs allege that Spencer's August and September hair tests were also false positives due to purported negligence and fraud.  Spencer insists that he does not use drugs and he knows that these tests were fraudulent (and negligently performed) because of discrepancies and omissions in the testing documentation for these tests.[6]

---

[6] The FAC does not identify why Spencer obtained the two private hair tests from Omega.  At most, the FAC vaguely suggests that he intended to provide the tests to the Family Court.  (FAC ¶ 159, 167, 169.)  The Court notes that in Spencer's related case against LabCorp, he alleges that he obtained the August 28 hair test from LabCorp in order to protect himself against "false positive" tests in Family Court.

### i. *Spencer's August 28, 2018 Test*

On August 28, 2018, Spencer paid for a private hair test through Rabu.  (LabCorp Complaint ¶¶ 29–30, 65–67, Exs. 2, 3.)  According to the litigation package for this test, LabCorp acted as the Third-Party Administrative Provider for this hair test, but the actual testing was performed by Psychemedics Corporation ("Psychemedics").  (Id., Ex. 3.)  This test was reported as positive for cocaine.  (Id. ¶¶ 32, 70–74, Exs. 1, 7, 3.)

Spencer does not challenge the administration and validity of the August 2018 test in the instant action.  However, as explained infra, Spencer has filed lawsuits concerning this August 28 test in both state and federal court.  As in the instant case, Spencer has alleged in these two suits that this August 28 drug test was a false positive and that this test result was fraudulent and a result of negligence.[7]  (Id. *passim*)

### ii. *Spencer's September 13 Hair Test*

On September 13, 2018, Spencer paid for a private hair test at Land, Sea & Air Medical ("LSA") and directed that his specimen be sent to Omega for testing.  (FAC ¶ 79.)  On September 18, 2018, Omega issued a one-page report indicating that his 1.5- inch hair specimen was positive for cocaine.  (Id., Ex. F.)  Spencer was confused why his hair follicle test reported "positive for cocaine when he didn't and doesn't use cocaine."  (Id. ¶ 81.)

---

[7]  In the LabCorp Case, which is pending before the undersigned, Spencer sued both LabCorp and Psychemedics.  Spencer v. Laboratory Corp. of America Holdings, No. 19-CV-04927-JMA (E.D.N.Y.)  The Court granted Psychemedics' motion to dismiss in November 2020.  See Spencer v. Laboratory Corp. of Am. Holdings, No. 19-CV-04927, 2020 WL 7024381 (E.D.N.Y. Nov. 30, 2020).  As explained in a Memorandum & Order that is being issued concurrently with the instant decision, the Court is granting LabCorp's motion to dismiss because Spencer has failed to plausibly allege, inter alia, that LabCorp was negligent or engaged in fraud (hereinafter the "LabCorp Decision").

### iii. *Spencer's September 26 Hair Test*

On September 26, 2018, Spencer paid Health Street for another private test and again requested that his hair specimen be sent to Omega for testing.  (Id. ¶ 82.)  On October 1, 2018, Omega issued a one-page report stating that Spencer's 1.5-inch hair sample yet again tested positive for cocaine.  (Id., Ex. H.)

Spencer did not submit any of these three positive hair tests to the Family Court.  He alleges that all three positive tests involved negligence and fraud.

### 5.  The Parents' Communications with EAC and Omega and the Events Following their Positive Hair Tests

On July 25, and August 1, 2018, Cooley contacted EAC to obtain the results of her July 2018 hair test but was informed by EAC employees that EAC's "system" was down.  (FAC ¶¶ 28, 69-71.)  On August 14, 2018, Cooley contacted Omega and was informed by someone named Anthony that "Omega's system" had not been down.  (FAC ¶ 72.)

In early September 2018, Cooley spoke with various EAC employees and none of them could tell her the exact dates when the "Omega system" was down.  (FAC ¶¶ 77–78.)

On October 9, 2018, the Parents sent a letter to EAC expressing their concerns about their "false positive cocaine results" from the November 27, 2017 and July 2018 hair tests.  (FAC ¶ 90; Ex. B.)  EAC never responded to this letter.  (FAC ¶ 30.)

On October 11, 2018, the Parents sent a similar letter to Omega questioning the collection date of Cooley's hair specimen, expressing concern about the delay in receiving the results, and stating that although EAC had stated that the system was down for a few weeks in July, Omega had informed her that its system was never down.  (FAC, Ex. C.)  Cooley questioned why it took between three and four weeks to report the results when, according to an Omega representative, it should have only taken between one and three business days.  (FAC, Ex. C.)  She complained that

she was not getting any answers to her concerns and that the positive result has negatively affected her in Family Court.  (FAC ¶ 31, Ex. C.)

On October 15, 2018, the Family Court informed the Parents that they would not be allowed to "relitigate" their "previous trial" on the basis of the allegedly incorrect July 2018 hair test.  (FAC ¶ 32.)  The Family Court, however, told the Parents that they would be permitted to address these issues at a dispositional hearing on October 25, 2018.  (FAC ¶ 32.)  The Family Court also requested that the Parents submit to hair tests.  The Parents, however,  refused to take additional hair tests until they obtained answers about their prior tests, which they claim were false positives.  (FAC ¶ 33.)  The Family Court then drew an adverse inference against the Parents for their refusal to take hair tests.  (FAC ¶ 34.)

On October 16, Bill Cori, Omega's CEO, spoke with the Parents over the phone concerning their questions about Cooley's July and August 2018 tests.  A transcript of that call is attached to the FAC.  (FAC, Ex. Q.)  On the call, Cori explained that the records for Cooley's August 2018 hair test showed that it "screened positive for cocaine," but was then "confirmed" to be "just under the cutoff level" for a positive test.  (Id. at 8.)  Cori stated that Cooley's August 2018 hair test was reported as negative because the "average quantitative value" for this 90-day sample was "under 500" which was the "cutoff level" for a positive test.  (Id. at 9.)

During the call, Cooley insisted that the negative result from her August 2018 hair test "contradicts" the July 2018 test.  (Id.)  Cori, however, explained that her August 2018 test was based on the "average of the hair" in the full 90-day sample whereas the July 2018 hair test— which analyzed three different hair segments—had "quant values [that] were going down over the 90 day timeframe."  (Id.)  Cori noted that the most recent 30-day hair segment for the July 2018 test was 531 pg/mg, which was right above the 500 pg/mg cutoff for a positive test.  (Id. at 7.)

Cori told the Parents that while they could order a litigation package for Cooley's August 2018 test, if they did, the "court will see there was cocaine." (Id. at 10.)

On this call, Cori also stated that the delay in the reporting of Cooley's July 2018 test results was due to the fact that the Family Court had not paid its bill to "EScreen," which resulted in the "their access being cut off." (FAC ¶ 37, Ex. Q at 14.)  Cori explained that the Suffolk County Court's account "was moved over to a sub-account of eScreen" and that, according to the company that owned EScreen, the account was put on hold on July 2. (FAC, Ex. Q at 3.)  Plaintiffs allege that they know this statement is false because Omega's August 14 report only lists Suffolk County Family as the requesting agency and because another Omega employee, Patrick Minno, subsequently gave a different explanation for the delay. (FAC ¶ 132.)

On October 17, 2018, the Parents' attorney, Robert Rambadadt, spoke with Minno, the Omega employee who had certified the results of Cooley's August 2018 hair test.  According to the FAC, Minno told Rambadadt that "there's a bit of a discrepancy because Cooley was in fact negative." (FAC ¶ 138.)  Minno also told Rambadadt that Cooley could "test positive a month after testing negative." (FAC ¶ 138.)  The FAC does not include any other details about this conversation between Minno and Rambadadt.

On October 25, 2018, the Family Court held another hearing.  At this hearing, the Parents called Minno to testify as a fact witness about Cooley's August 2018 drug test. (FAC ¶ 139.)  The Parents paid Minno $825 for this testimony.  A transcript of Minno's testimony from the hearing is attached to the FAC. (FAC, Ex. R.)  During the hearing, Minno testified that he had certified the negative result for Cooley's August 2018 test. (Id. at 48.)  On direct examination, he explained that Cooley's sample first underwent an "initial test for screening" that came back with a

"presumptive positive" result.[8]  (Id. at 48.)  He then explained that presumptively positive samples undergo confirmatory testing that provide a specific "value of the drug and its metabolites" and that results below the designated "cut off value" are reported as "negative."  (Id. at 49.)  Minno explained that Cooley's confirmatory test was "negative."  (Id.)  On direct examination, the Parents' attorney did not ask Minno any questions about the July 2018 test results or ask Minno whether the two results were contradictory.

On cross-examination, Minno was asked about Cooley's July 2018 test results and, over the objections of the Parents' counsel, testified about the results of that test.  Minno identified the results for the three half-inch segments in the July 2018 test, including the most recent 30-day segment, which tested positive at 531 pg/mg, right above the cutoff.  (Id. at 56.)  Minno then explained, on both cross and re-direct examination, that Cooley's July 2018 and August 2018 results did not contradict each other because these tests involved different collection time frames and a different collection base.  (Id.)  Minno further explained these two results were consistent because for a "90-day test" such as the August 2018 test "you can't pinpoint day one or day 90" and the most recent half-inch segment from the July 2018 test was already at a "low level right at the cutoff" for a positive test.  (Id.)

Finally, on re-direct, the Parents' attorney asked Minno "if there was an explanation" why the result for the July 2018 test was not reported until August 14 and Minno responded "no."  (Id. at 60.)  When asked if such delays happen in "the normal course of business at your lab," Minno responded: "No.  I thought it was, like, something to do with, like an amended report or something

---

[8]  The FAC alleges that Minno's statement about this test being presumptively positive must be false because Minno did not say anything about this fact during his October 17 call with the Rambadadt.  (FAC ¶ 144.)  This allegation is utterly implausible and makes no sense.  The day before the call between Minno and the Parents' attorney, Cori told the Parents that Cooley's August 2018 hair test "screened positive for cocaine."  Additionally, the litigation package for the August 2018 hair test—which is attached to the FAC—indicates that the initial screening test was positive.

on your client and I am not sure." (Id. at 60.)  Minno also stated that amended reports occur when there is a "wrong spelling of a name or something on those lines."[9]  (Id. at 61.)

At the end of the hearing, the Parents were ordered to complete mental/drug evaluations at a drug program and to take further hair tests through EAC.  (Id. ¶ 42.)  The minor children were ordered to remain in Spencer's parents' custody until July 17, 2019.  (Id. ¶ 42.)  The Parents, however, refused to submit to the hair tests.  (FAC ¶ 45.)

On March 4, 2019, during a permanency hearing, the SCCPS attempted to permanently remove SS and Z.S1 from the Parents' custody due to their failure to comply with the court's October 25, 2018 order requiring them to take further hair tests through the EAC.[10]  (Id. ¶¶ 44-45.)  At this hearing, the Parents testified that they were afraid that these tests would again be "false positives" because they were "substance free."  (FAC ¶ 45.)  The Parents' parental rights were not terminated, but the Family Court ordered that they participate in a mental/drug evaluation instead of drug testing.  (Id. ¶ 46.)  Between March 7, 2019 and May 29, 2019, the Parents completed mental/drug evaluations "after testing negative for all substances on all tests."  (Id. ¶ 47, Ex. D.)

On April 2, 2019, during a hearing regarding the Parents' refusal to submit to hair tests, the SCCPS sought their incarceration at the Suffolk County DWI facility.  (Id. ¶ 49.)  However,

---

[9]  Plaintiffs contend that Minno's testimony contradicts the explanation for the delay provided by Cori.  Notably, while Minno certified the results for Cooley's August 2018 hair test, a different Omega employee certified the results of the Cooley's July 2018 hair test.  (FAC, Ex. A.)  Minno never claimed to have been personally involved in the July 2018 hair test.  When asked if he knew whether there was an explanation for the reporting delay, Minno immediately responded "no."  When he was questioned further, he speculated as to the possible reason for the delay and made clear that he was "not sure" what happened.

[10]  Spencer's complaint in the LabCorp Case alleges that, on January 15, 2019, Cooley obtained a private hair test from LabCorp that was reported negative for all substances.  (LabCorp Complaint ¶ 44, Ex. 5.)  This negative test, which was more than five months after Cooley's July 2018 test, has little relevance to Plaintiffs' claims about the validity of the July 2018 test.  The Court notes that the record does not indicate if or when Cooley submitted this January 2019 negative test to the Family Court.

the SCCPS agreed to adjourn the hearing since the Parents were enrolled in a drug program at the YMCA.  (Id.)

On April 10, 2019, Cooley gave birth to Z.S2 in a New York City hospital and left the baby with her brother.  (Id. ¶ 51.)  On or about June 14, 2019, the SCCPS filed a petition for derivative neglect against the Parents with regard to Z.S2, and on June 18, 2019, the Family Court found that the Parents neglected Z.S2 and ordered SCCPS monthly supervision of the Parents until July 17, 2020.  (Id. ¶ 54.)  On July 17, 2019, the Parents' children were returned to them with a court order of monthly supervision by SCCPS until July 17, 2020.  (Id. ¶ 55.)  According to the Parents, they were successfully monitored until July 17, 2020, and there are currently no open petitions against them.  (Id. ¶¶ 56-57.)

### 6.  Litigation Packages

In November and December 2018, the Parents paid Omega for "litigation packages" concerning Cooley's August 2018 hair test, and Spencer's September 13 and September 26 hair tests.  (FAC ¶¶ 97–97, 105; FAC, Exs. FAC, Exs, L, O.)  Spencer also ordered and obtained a litigation package from LabCorp for his August 28 hair test.  (LabCorp Complaint, Ex. 3.)  A litigation package contains a certification, explains how the tests were performed and the results, and also includes extensive testing documentation including a copy of the CCF, a picture of the seal for the sample that the donor has initialed, and internal laboratory chain of custody paperwork.

The FAC also contains allegations about the Parents' purported attempts to obtain litigation packages for the November 2017 hair tests and the July 2018 hair test.

On October 23, 2018, Rambadadt spoke with David Englehart, Omega's Laboratory Director.  (FAC ¶ 95.)  Englehart told Rambadadt that he could order the litigation packages for these tests through EAC, which was the requesting agency for these tests.  (Id.)

That same day, the Parents were at Family Court and asked EAC's Gregory Kelly to request a litigation package for the November 2017 and July 2018 tests.  (FAC ¶ 96.)  Kelly told them that he did not know what a litigation package was and that the Parents should speak to Omega.[11]  (Id.)

According to the FAC, Rambadadt tried to call Englehart again later that day, but was "never able" to get in contact with him and no call was returned by Englehart.  (FAC ¶ 97.)

Despite the FAC's allegation that Rambadadt was "never able" to get in contact with Englehart, the FAC admits that on November 20, Englehart "agreed to provide" Rambadadt with a litigation package for Spencer's September 26 private hair test.  (FAC ¶ 98.)  The FAC also alleges that on November 21 and December 7, 2018, Englehart "agreed . . . to provide" Rambadadt with a litigation package for Spencer's September 13 private hair test.  (FAC ¶ 103.)  The FAC does not allege that Rambadadt ever raised the issue of litigation packages for the November 2017 and July 2018 tests during these subsequent communications with Englehart.

The FAC alleges, without any further elaboration, that "Rambadadt tried to order the litigation packages from" EAC and was unsuccessful.  (FAC ¶ 125.)  The FAC does not identify who Rambadadt contacted at EAC or what these alleged efforts entailed.

According to the FAC, another attorney who subsequently represented the Parents obtained a subpoena from Family Court that directed EAC to disclose all of its records about the Parents' drug tests.  (FAC ¶ 126; see also Compl. Ex.)  EAC did not respond to the subpoena.  (Id.)  The FAC does not allege that either of the Parents' attorneys ever sought to subpoena documents from Omega concerning these tests.

---

[11] Plaintiffs' state court complaint against EAC alleges that Kelly was employed as a "Manager Aide."  (Pls' Proposed Second Amended Complaint ("EAC PSAC") ¶ 11, Spencer v. Eac Network, Index No. 003870/2019).)

B. **Procedural Background**

On August 14, 2020, Plaintiffs, proceeding pro se, filed the instant action.  (ECF No. 1.)

On October 22, 2020, this Court ordered the Parents to retain counsel to represent their Minor

children in this action.  (ECF No. 14.)   On October 14, 2021, Plaintiffs, represented by counsel,

filed the FAC asserting claims for negligence, negligent infliction of emotional distress, fraud, and

fraudulent concealment.  (ECF No. 24.)  The next day, their counsel informed the Court that they

had just been "relieved" by Plaintiffs.  (ECF No. 25.)  Plaintiffs have subsequently been

represented by various counsel at certain points during this litigation.

On May 31, 2022, defendants filed the instant motion to dismiss pursuant to Federal Rule

of Civil Procedure 12(b)(2) and 12(b)(6).  (ECF No. 41.)  Plaintiffs filed a pro se opposition to

Defendants' motion to dismiss.  Proceedings were further delayed because the minor children did

not have counsel.  After the minor children obtained counsel, the Court gave their counsel an

additional opportunity to file an opposition brief on behalf of the minors.  That opportunity was

declined.  (ECF No. 51.)

The Parents have also filed at least three related suits in state court and one related suit in

federal court.

In January 2019, Plaintiffs filed suit in New York State Supreme Court, Suffolk County,

against EAC, three individual employees of EAC, Omega, and four individual Omega employees.

Spencer v. EAC Network, Index No. 03870/2019 (N.Y. Supreme Court, Suffolk County).

Plaintiffs' complaint and first amended complaint in this state court action alleged claims for fraud,

intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress.

In May 2020, the state court dismissed the claims against Omega and its employees because the

facts set out in the complaint were insufficient to allege personal jurisdiction over these out-of-

state defendants.  EAC and its employees then moved to dismiss the complaint.  Plaintiffs opposed the motion and, represented by counsel, sought leave to file a second amended complaint. Plaintiffs' proposed second amended complaint added claims for negligence and negligent misrepresentation, and abandoned the IIED claim.  In September 2021, Justice George Nolan granted the EAC defendants' motion to dismiss and denied Plaintiffs leave to file their second amended complaint.  Spencer v. Eac Network, No. 003870/2019, 2021 N.Y. Misc. LEXIS 14609, at *7 (N.Y. Sup. Ct. Sep. 24, 2021).

In August 2019, Spencer filed his related federal suit against LabCorp and Psychemedics concerning the August 28 hair test, which is pending before the undersigned.  Spencer v. Laboratory Corp. of America Holdings, No. 19-CV-04927-JMA (E.D.N.Y.)  In November 2020, this Court granted Psychemedics' motion to dismiss Spencer's fraud, IIED, and negligent infliction of emotional distress claims.  Spencer v. Laboratory Corp. of Am. Holdings, No. 19-CV-04927, 2020 WL 7024381 (E.D.N.Y. Nov. 30, 2020).  Spencer then amended his complaint to also include a negligence claim against LabCorp, which then moved to dismiss the amended complaint.  As explained in an order that is being issued concurrently with the instant decision, the Court is granting LabCorp's motion to dismiss in the LabCorp Case because Spencer has failed to plausibly allege, inter alia, that LabCorp was negligent or engaged in fraud.

In August 2019, Spencer also filed suit in New York State Supreme Court, Nassau County, against Rabu, which collected his hair sample on August 28, and Doctors Review Services, which served as the Medical Review Officer ("MRO") for this test.  Spencer v. Rabu Diagnostic Services, Index No. 000949/2019 (N.Y. Supreme Court, Nassau County).  Spencer's complaint in this state court action alleged claims for fraud, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress.  In December 2020, the state court granted summary

judgment in favor of the defendants.  Spencer v. Rabu Diagnostic Services, Index No. 000949/2019, 2020 N.Y. Misc. LEXIS 44501 (N.Y. Supreme Court, Nassau County).

Plaintiffs also filed suit in state court against Suffolk County and related defendants concerning the drug test of their minor child who tested positive for cocaine.  Spencer v. County of Suffolk, Index No. 622233/2019.

## II.  DISCUSSION

### A. Rule 12(b)(6) Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  Mere labels and legal conclusions will not suffice.  Twombly, 550 U.S. at 555.  In reviewing a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).  A court may also consider materials attached to the complaint, materials integral to the complaint, and materials incorporated into the complaint by reference.  Sira, 380 F.3d at 67.

While a court is required to read a plaintiff's pro se complaint liberally and interpret it as raising the strongest arguments it suggests, a pro se plaintiff must still plead "enough facts to state

a claim to relief that is plausible on its face."[12] Twombly, 550 U.S. at 570; see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

This Court has jurisdiction over Plaintiffs' state law claims based on diversity, pursuant to 28 U.S.C. § 1332.  The Court finds that substantive New York law applies to this diversity action and no party argues otherwise.

For the reasons discussed below, the FAC fails to allege plausible claims against the defendants for fraud, fraudulent concealment, negligence, or negligent infliction of emotional distress.  Accordingly, the Defendants' motion to dismiss the FAC is granted as to all defendants.[13]

Before discussing each of Plaintiffs' specific causes of action, the Court will first address Defendants' argument that all of Plaintiffs' claims concerning the November 2017 and July 2018 tests are barred by judicial immunity because these three tests were ordered by the Family Court.

---

[12] Given that Plaintiffs have been represented at various points during this litigation, including at the time when they filed the FAC, it is not clear that Plaintiffs should receive the solicitude ordinarily afforded pro se litigants.  The Court has nevertheless assumed, for the sake of argument, that such solicitude applies here and has considered Plaintiffs' submissions accordingly.

[13] All Defendants, including Omega and the individual defendants, seek dismissal of Plaintiffs' claims under Rule 12(b)(6).  The individual defendants also assert that this Court lacks personal jurisdiction over them and seek dismissal on that basis under Federal Rule of Civil Procedure 12(b)(2). (Defs.' Mem. at 22-24, ECF No. 41-1, at 22-24.)  Omega, however, does not challenge personal jurisdiction.  As explained below, the Court concludes that all of Plaintiffs' claims against Omega fail under Rule 12(b)(6).  The claims against the individual defendants also fail for the same reasons.  Accordingly, the Court may dismiss the individual defendants pursuant to Rule 12(b)(6) and does not need to reach the individual defendants' challenges to personal jurisdiction.  See ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013) (explaining that "[i]n cases involving 'multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,'" courts may "proceed[] directly to the merits on a motion to dismiss") (quoting Chevron Corp. v. Naranjo, 667 F.3d 232, 246 n. 17 (2d Cir. 2012)); see also SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring) (discussing when, in cases with multiple defendants, it is appropriate to "assume personal jurisdiction arguendo and direct a dismissal with prejudice for failure to state a claim").

B. **Judicial Immunity for the November 2017 and July 2018 Court-Ordered Hair Tests**

Defendants argue that they are entitled to judicial immunity because Omega conducted the November 2017 and July 2018 hair tests pursuant to the Family Court's orders.  (See also FAC, Ex. A (Omega report for positive July 2018 that lists "Suffolk County Court" as the "requesting agency")).

In Mosher-Simons v. Cty. of Allegany, 99 N.Y.2d 214, 783 N.E.2d 509, 513 (N.Y. 2002), the Court of Appeals held that the defendant county—which had authored a court-ordered home study report given to the family court in a child custody proceeding—was "cloaked with judicial immunity" for its role in "the antecedent fact-gathering process necessary for the court to reach [its] placement decision."  Id. at 220; see also Tripi v. Alabiso, 189 A.D.3d 2133, 2134, 134 N.Y.S.3d 895, 896 (N.Y. App. Div. 4th Dep't 2020) (finding court-appointed forensic psychiatric expert had judicial immunity from suit for work he performed in connection with child custody litigation).  One New York state court decision extended this immunity to a court-appointed medical laboratory that was alleged to have acted negligently in performing court-ordered paternity tests.  See Pertilla v. Genetic Design, Inc., 166 Misc. 2d 843, 844-45 (N.Y. Sup. Ct. 1995) (holding that court-appointed medical laboratory was entitled to "quasi-judicial" immunity in negligence action for performing court-ordered paternity).

The Court of Appeals, however, has not squarely addressed this issue in the context of court-ordered drug testing.  As explained below, in Landon v. Kroll Laboratory Specialists, Inc., 22 N.Y.3d 1, 6-7 (N.Y. 2013)—the seminal case which recognized that drug testing laboratories owe third parties a duty of care—one of the plaintiff's conditions of probation was a requirement that he submit to random drug testing.  Pursuant to a contract with "Orange County and/or the Orange County Probation Department," the defendant laboratory "was engaged to test oral fluid

19

samples provided by probationers for the presence of illicit or controlled substances." Id. at 4. The plaintiff alleged that the laboratory's reporting of a positive test result was negligent and that this positive result caused the plaintiff's probation to be extended.  The Court of Appeals' decision states, in passing, that "the existence of [the lab's] contract with the County does not immunize" the lab.  Id. at 7.  However, in Landon, the Court of Appeals did not cite Mosher or explicitly discuss judicial immunity.  Notably, the parties' briefs to the Court of Appeals did not even mention the principle of judicial immunity.

One federal court recently noted—in the context of remanding a case to state court—that, after Landon, it was a novel question of New York law "whether common-law judicial immunity . . . protect[s] an independent drug testing agency, its affiliates, and employees from suit on the grounds that they acted as arms of a court" that ordered the relevant drug tests.  Weber v. Quest Diagnostics of Pennsylvania, Inc., No. 20-CV-00324, 2020 WL 6372382, at *6 (W.D.N.Y. Oct. 29, 2020).

After the federal court remanded the Weber case back to state court, the state court denied the defendants' motion to dismiss, which sought dismissal on the basis of judicial immunity. Weber v. Quest Diagnostics, Index No. 801624/2020 (Supreme Court, Erie Count) (July 13, 2021 Order.)  In Weber, the plaintiff was arrested for DWI and entered into a Town Court's drug program.  As part of the program, the plaintiff had to enroll in a private drug treatment program certified by New York State and had to submit to random drug tests.  The drug treatment program approved the testing protocols and supervised the results.  The plaintiff's insurance, however, paid for drug tests through the treatment program.  Alleging negligence, the plaintiff sued both the center that ran the private drug treatment program as well as the laboratory that conducted the tests. In denying the defendants' motion to dismiss that sought to invoke judicial immunity, the state

court stressed the fact that the "testing was not arranged and paid for by a state or municipal entity as part of the criminal justice system."

There are appear to compelling reasons why judicial immunity should apply here.  See B.W.D. v. Turnage, No. 05-13-01733-CV, 2015 WL 869289, at *1 (Tex. App. Mar. 2, 2015) (finding drug testing laboratory was immune for negligence in connection with court-ordered drug test).  The Family Court ordered the tests at issue here and held hearings concerning the Parents' court-ordered drug tests.  The Omega test report explicitly lists the "Suffolk County Court" as the "requesting agency" and Plaintiffs do not allege that they paid for the tests.[14]

It is ultimately unnecessary for the Court to decide this unsettled question of New York law because, as explained below, Plaintiffs' claims fail on other grounds.

## C.  Negligence Claim

### 1.  Legal Standard and Overview

A prima facie case of negligence under New York law requires: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  Pasternack v. Laboratory Corp. of Am. Holdings, 807 F.3d 14, 19 (2d Cir. 2015).

Though generally a contractor "does not owe an independent tort duty of care to a non-contracting third party," Dung Nguyen v. Morrison Healthcare, 412 F. Supp. 3d 196, 202 (E.D.N.Y. 2018), there is an exception where the contracting party, in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm.  Id. (citing Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140 (2002)).  Pursuant to this exception, the New York Court of Appeals has held that a laboratory has "a duty to the test subject to perform

---

[14]   The Family Court was intimately involved in the underlying events at issue here, which include, inter alia, allegations concerning the Family Court's purported failure to pay bills for court-ordered drug tests.

his drug test in keeping with relevant professional standards," despite the lack of a contractual relationship.  Landon, 22 N.Y.3d at 6-7.

In Landon, the plaintiff alleged that the laboratory falsely reported that he had tested positive for THC in connection with a toxicology test that failed to adhere to federal and manufacturer cutoff standards and state confirmatory testing requirements.  Id. at 5.  The Landon Court held that despite the absence of a contract between the plaintiff and defendant, the laboratory owed a duty of care to test the plaintiff's biological sample "in keeping with relevant professional standards."  Id. at 6-7.  The court reasoned that there were strong public policy considerations for finding a duty under those circumstances because a false positive test result could have "profound, potentially life-altering consequences for a test subject."  Id. at 6.

Three years after Landon, the Court of Appeals, in Pasternack v. Laboratory Corp. of Am. Holdings, clarified when laboratories and program administrators owe a duty, explaining that liability "does not encompass every step of the testing process" and that violating federal testing regulations "unrelated to the actual performance of scientific testing" is not alone sufficient to create liability.  27 N.Y.3d 817, 826 (N.Y. 2016).  Rather, a laboratory's duty of care is "limited to 'th[o]se circumstances'—namely, a drug laboratory's failure to adhere to professionally accepted scientific testing standards in the testing of the biological sample."  Id. (declining "to extend Landon's reasoning to impose a duty upon a laboratory to test subjects that requires the laboratory to adhere to aspects of the federal regulations and guidelines that do not implicate the scientific integrity of the testing process.") (quoting Landon, 22 N.Y. 3d at 7.)

As explained below, a number of Plaintiffs' allegations concern acts or omissions by parties other than Omega, including EAC and other entities that collected the hair samples.  When a separate entity collects the sample from the donor, a testing laboratory is ordinarily not liable for

alleged negligence by a collector.  See Santiago v. Greyhound Lines, Inc., 956 F. Supp. 144, 155 (N.D.N.Y. 1997); Bass v. DISA Glob. Sols., Inc., 2020-0071, 318 So. 3d 909, 920 (La. App. 1 Cir. Dec. 30, 2020 (holding, under Louisiana law, that laboratory was not responsible for actions of independent third-party collector where there was no evidence that the laboratory "exercised control over [collector's] employees regarding the hair sample drug testing collection process"), writ denied, 2021-00147, 313 So.3d 273 (La. Mar. 23, 2021).

Here, Plaintiffs have not plausibly alleged that Omega controls any of the third-party collectors.  Accordingly, Plaintiffs must plausibly allege that Omega was itself negligent and violated a duty of care that implicated the scientific integrity of the testing process.  See Santiago, 956 F. Supp. at 155 (assuming, for the sake of argument, that laboratory had duty to examine chain of custody form for irregularities, but granting summary judgment to laboratory because alleged irregularities were too "innocuous" to indicate negligence and laboratory's failure to detect signature forged by collector was not negligent); Shaw v. Psychemedics Corp., 426 S.C. 194, 199 n.2, 826 S.E.2d 281, 283 (S.C. 2019) ("If there are separate entities involved at different stages of the testing process, a drug testing laboratory is liable only for its own negligence or the negligence of another actor properly imputed to the laboratory.").[15]

As an initial matter, the Court finds persuasive Justice Nolan's decision in Spencer v. Eac Networks, which dismissed Plaintiffs' related negligence claims against EAC in connection with the November 2017 and July 2018 hair tests.  Additionally, an examination of Plaintiffs' factual allegations and the exhibits attached to Plaintiffs' pleadings makes clear that Plaintiffs have not

---

[15]  It is not clear to what extent a laboratory has a duty under New York law to review chain of custody documents for irregularities or when such a duty would require a laboratory to reject a sample.  However, even assuming that such a duty exists, as detailed below, Plaintiffs have not plausibly alleged that Omega acted negligently and breached any such duty here.

plausibly alleged negligence claims against Omega (or any of the individual defendants) concerning any of the tests at issue.[16]

### 2. Justice Nolan's Decision in <u>Spencer v. Eac Networks</u>

Relying on many of the same primary allegations and documents, Plaintiffs sued EAC in state court, alleging negligence and other claims.  Plaintiffs' pleadings in this state court action against EAC included many of the same central factual allegations as the instant federal suit, including Plaintiffs' allegations that:

> (1) although EAC collected Cooley's hair sample on July 11, 2018, the EAC memorandum to Family Court and the August 14 Omega report for this test erroneously list the collection dates as July 10 and July 12, respectively, (Pls' Proposed Second Amended Complaint ("EAC PSAC") ¶ 26, <u>Spencer v. Eac Network</u>, Index No. 003870/2019);

> (2) in July and August 2018, Plaintiffs received contradictory information from EAC and Omega about whether the "system" was "down" during the time period when Cooley was waiting for her test results to be reported, (<u>id.</u> ¶¶ 32–33. 36);

> (3) Cooley's 90-day hair test taken in August 2018 was negative, (<u>id.</u> ¶ 34);

> (4) Cooley does not use drugs, (<u>id.</u> ¶ 41);

> (5) EAC failed to respond to a judicial subpoena to produce copies of all the drug tests it performed, (<u>id.</u> ¶ 48);

> (6) the CCF for Spencer's November 2017 hair test was missing the time the hair sample was collected because EAC's employee failed to input that information and then Omega disregarded the fact that chain of custody was not complete, (<u>id.</u> ¶ 30); and

> (7) defendants failed to "properly, accurately and diligently test, interpret and report and communicate" the test results to the court and instead reported incorrect information to the court, (<u>id.</u> ¶¶ 71, 79, 80).

---

[16]  For ease of reading, the Court's discussion below explains why the FAC fails to allege plausible claims against Omega.  Plaintiffs have also sued individual employees of Omega.  Plaintiffs' claims against the individual defendants all fail for the same reasons.

Plaintiffs' pleadings in this state court case also included, as exhibits, many of the same documents that are attached to the complaints in the instant suit and are the basis for their claims in federal court, including:

(1) EAC's August 14, 2018 memorandum to the Family Court that lists July 10 as the date when Cooley's hair sample was taken for her July 2018 positive test; (id. Ex. 3);

(2) Omega's August 14, 2018 report for Cooley's positive July 2018 test which lists the date "collected" as July 12, 2018, (id.);

(3) the negative test results and accompanying CCF for Cooley's "negative" August 2018 hair test, (id., Ex. 5);

(4) an excerpt of Minno's testimony at the October 25, 2018 hearing in Family Court concerning the delay in the reporting of the July 2018 test result, (id., Ex. 6); and

(5) the CCF for Spencer's November 2017 hair follicle test, which does not include the time when his hair sample was collected, (id., Ex. 2.)

Plaintiffs' pleading also included the letter the Parents wrote to EAC in which they maintained that their hair tests should not "be positive because we don't use any drugs."  (Id., Ex. 9.)

In September 2021, Justice Nolan granted the EAC defendants' motion to dismiss and denied Plaintiffs leave to file their second amended complaint which sought to add a negligence claim.  Spencer v. Eac Network, Index No. 003870/2019, 2021 N.Y. Misc. LEXIS 14609, at *7 (N.Y. Sup. Ct. Sep. 24, 2021).  In dismissing Plaintiffs' negligence claim, Justice Nolan reasoned that Plaintiffs did not allege that the purported "administrative errors by the EAC defendants implicated the scientific integrity of the tests" and, as such, "the EAC defendants owed no duty to the plaintiffs" and "there is no basis for a negligence claim against them."  Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7.

Plaintiffs' claims against Omega are largely premised on the same central factual allegations and documents.  To the extent Plaintiffs seek to hold Omega liable for the alleged negligence of EAC, such arguments fail because: (1) Omega is not liable for the alleged negligence of a separate entity such as EAC that collects donor samples; (2) as explained below, with the exception of the missing time information on Spencer's November 2017 CCF, the FAC does not plausibly allege that Omega was aware of (or even should have been aware of) EAC's alleged errors when Omega reported the Parents' results as positive.  Moreover, the Court is also persuaded by Justice Nolan's decision in Spencer v. Eac Network and similarly concludes that the FAC fails to plausibly allege that EAC's purported administrative errors implicated the scientific integrity of Omega's tests.  Accordingly, even if Omega was aware of such errors—including EAC's failure to note the time Spencer's November 2017 hair sample was collected—the FAC has not alleged plausible negligence claims premised on those errors.  Based on the logic of Justice Nolan's decision, the Court also concludes that the FAC has failed to plausibly allege that the purported errors by Omega itself, which are similarly "administrative," implicated the scientific integrity of the Parents' November 2017 tests and Cooley's July 2018 hair tests.[17]

Justice Nolan's dismissal of Plaintiffs' claims concerning Cooley's July 2018 hair test is particularly notable.  As in the instant suit, Plaintiffs alleged in the state court litigation that: (1) Cooley did not use drugs; (2) her 90-day hair test in August 2018 was negative; (3) EAC collected Cooley's hair follicle sample on July 11; (5) testing documentation from EAC and Omega contained incorrect collection dates; (6) EAC and Omega gave allegedly conflicting responses about the "system" being down between the alleged collection date of Cooley's sample

---

[17]  Spencer's two hair tests from September 2018 were not at issue in the state court litigation.  As explained further below, the alleged administrative errors that Plaintiffs identify concerning these two hair tests also do not implicate the scientific integrity of those tests.

and Omega's report of the test results on August 14; and (7) EAC failed to respond to a judicial subpoena directing it to produce its records concerning Plaintiffs' drug tests.  Justice Nolan found—and this Court agrees—that these allegations are insufficient to allege that these purported "administrative errors" implicated the scientific integrity of Omega's testing.

Not only does the Court find Justice Nolan's analysis persuasive, but, as explained in detail below, Plaintiffs' factual allegations and the exhibits attached to the FAC do not plausibly allege negligence claims against Omega concerning any of the tests at issue.  In the specific circumstances of this case, Plaintiffs' conclusory allegations of negligence are insufficient to plausible negligence claims.  (FAC ¶¶ 151–162).  Moreover, as explained below, the specific factual allegations set out in the FAC do not render these negligence claims plausible.

### 3.  The Parents' Allegations that They Do Not Use Drugs Do Not Render Their Claims Plausible

Plaintiffs insist that they do not use drugs and that, as such, all their positive tests are "false positives" and must have been negligently conducted or have been outright "fraudulent."  However, Plaintiffs' allegations that they do not use drugs are, given all the circumstances and allegations here, insufficient to plausibly allege that the tests at issue were negligently administered or fraudulent.  See Velez v. Microgenics Corp., No. 20-CV-387, 2020 WL 4043240, at *3 (W.D.N.Y. July 16, 2020) (finding plaintiff failed to allege negligence claim where he alleged that drug test "produced a false positive test," identified "a list of the steps at which Defendants could have made errors" and included "conclusory claims of a breach of duty");  Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7; cf. Sagraves v. Lab One, Inc., 316 F. App'x 366, 371 (6th Cir. 2008) ("Plaintiff cites his signed affidavit, stating that he has never used cocaine. This affidavit, however, is merely an assertion, not competent evidence demonstrating that [the defendant laboratory] violated a duty of care.").

Plaintiffs' negligence and fraud claims are particularly implausible here given the sheer number of positive test results that have been reported for Spencer, Cooley, and even one of their children as well as the fact that, as discussed below, even Cooley's "negative" August 2018 test detected cocaine levels in her hair sample and does not contradict her July 2018 test.[18]

### 4. The Parents' Negative Urine Tests and Hair Test Do Not Render Their Claims Plausible

The Parents' negative urine tests have little probative value because they involved a different type of test on a different biological specimen. Cf. Bass, 318 So. 3d at 921 ("[T]he results of a different lab test on a different type of biological sample does not create a genuine issue of material fact as to whether the results of Psychemedics's thrice-confirmed positive hair sample drug test results were inaccurate due to any negligence on Psychemedics's part. Simply showing the presence of disputed or conflicting facts (here, a negative urine test vs. a positive hair sample test) is insufficient if there is no legal issue presented by those contested facts."). The Parents' negative urine tests do not plausibly suggest that Omega acted negligently concerning their hair tests.

Additionally, contrary to Plaintiffs' claims, Cooley's "negative" August 2018 hair test does not plausibly undermine the validity of the positive July 2018 hair test.

First, the sample for the August 2018 hair test was collected on August 17, 2018—more than five weeks after the collection for the July 2018 test.

Second, although both of these hair tests were "90 day" tests, these samples were not subjected to the same type of 90-day tests. The record indicates that, like Cooley's court-ordered

---

[18]  As noted earlier, Spencer has asserted in two separate lawsuits that his August 28 positive hair test was a result of fraud and negligence. As explained in the LabCorp Decision, Spencer failed to plausibly allege that this test was negligently performed. In any event, even if the Court were to completely disregard the August 28 test, the Court would still conclude that Plaintiffs have failed to plausibly allege that Omega acted negligently in connection with the tests it performed.

November 2017 hair test, Cooley's July 2018 hair test was a 90-day test for which 1.5 inches of hair were collected and then three half-inch hair segments were analyzed—Sections A, B, and C. (FAC, Ex. A; Compl. Ex. 3 (documents concerning November 2017 test).)  Each of these sections represented a 30-day period.  The hair in Section C would cover the period of 60–90 days before the test; the hair in Section B would cover the 30–60 day-period; and the hair in Section A had the newest hair closest to the scalp, which would be the 0–30 day-period.  (FAC, Ex. A; Ex. I; Ex. Q at 2, 7; Ex. R, Tr. 53; Compl., Ex. 3.)

While Cooley's August 2018 hair test was also a 90-day test that involved a 1.5 inch-hair sample, the August 2018 test did not involve three half-inch segments covering distinct 30-day periods that were each separately tested.  Rather, for the August 2018 hair test, a single 1.5 inch-hair sample, which represented the entire 90-day period, was tested.  (FAC, Ex. E.)

Those distinctions alone undercut Plaintiffs' argument that her negative August 2018 test establish that that her negligence and fraud claims concerning the positive July 2018 test are plausible.  Cf. Tilson v. DISA, Inc., 828 Fed. App'x. 193, 197 (5th Cir. 2020) (noting that "subsequent negative drug tests are often of little evidentiary value").

Moreover, while Plaintiffs insist that Cooley's "negative" August 2018 hair test contradicts the "positive" July 2018 hair, the underlying data for the August 2018 test in the record does not contradict the July 2018 positive test.  In fact, the August 2018 test results affirmatively undermine the plausibility of Plaintiff's claims about the July 2018 test.

The "cocaine" levels for Cooley's July 2018 hair test results were reported as:  1,535 pg/mg for Section C, 865 pg/mg for Section B, and 531 pg/mg for Section A, which covered the most recent 30-day period.  (FAC, Ex. A; Ex. Q at 7; Ex R at 53–54; see also FAC, Ex. C (letter admitting that July 2018 test was reported as "positive for 30, 60, 90 day interval.").)

The litigation package for Cooley's August 2018 hair test indicates that this 1.5-inch sample tested "positive" for cocaine in an initial screening test and was then subjected to a second round of confirmatory testing.  (FAC, Ex. L at 3; see also FAC, Ex. R at 47–49.)  This second test confirmed the presence of "cocaine" at a level of 275 pg/mg, which was below Omega's 500 pg/mg reporting limit for positive tests.  (Id.)  As such, the August 2018 sample was reported as a "negative" test.  (Id.; FAC, Ex. E.)

The August 2018 test results are, thus, not inconsistent with the July 2018 results.  Some levels of cocaine were detected in all these samples and those levels even appear to be on a generally consistent downward trajectory.  The most recent half-inch segment from Cooley's July 2018 hair test was reported as containing only 531 pg/mg, which was just above the 500 pg/mg cutoff for a positive test.

Plaintiffs ignore all of these details of the tests and insist that July 2018 and August 2018 must be contradictory simply because the July 2018 test was reported as "positive", and the August 2018 test was reported as "negative."

Plaintiffs seem to suggest that because Omega's August 17, 2018 report states that her August 2018 test was "negative," that, necessarily, no cocaine levels were detected in her sample.  However, Omega's August 17, 2018 report explicitly states that a "negative result" simply indicates that cocaine was not "detected at a concentration equal to or greater than" the "listed cutoff level" of 500 pg/mg.  (FAC, Ex. E.)  Plaintiffs also seem to assume that because no quantitative result is listed on the August 17 report that the level of cocaine detected in Cooley's August 2018 sample must have been zero.  However, the FAC does not allege that, when Omega reports hair test results, Omega's one-page reports ordinarily include the quantitative results for "negative" test results that fall below the designated cutoff level.

While the FAC alleges, in conclusory fashion, that Cori and Minno lied, the FAC does not specifically allege that the test results in the litigation package for the August 2018 test are false or fabricated documents. Moreover, Cooley relies extensively on the August 2018 hair test in support of her claims, and insists that this August 2018 test result is accurate. The FAC does not plausibly allege that the August 17 report for this report was accurate, but that the underlying data produced by Omega—which is consistent with the August 17 report—is somehow fabricated.

### 5. Purported Discrepancies and Omissions in Testing Documentation Do Not Plausibly Suggest that the Omega Defendants Were Negligent or Produced "Fraudulent" Documentation

#### i. The November 2017 Tests

Plaintiffs allege that the November 2017 hair tests were false positives and negligently conducted. For Spencer's November 2017 hair test, the EAC collector failed to indicate on the CCF the time of day when Spencer's hair sample was collected. The FAC, however, does not plausibly allege that this omission affected the scientific integrity of this test or that Omega was negligent for not rejecting this sample. See Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7. Notably, Spencer himself signed and dated this CCF. (Comp., Ex. 3.)

As for Cooley's November 2017 hair test, Plaintiffs do not even point to any alleged discrepancies on the CCF for that test.

#### ii. Cooley's July 2018 Hair Test

On August 14, 2018, Omega reported the positive results for the July 2018 hair test. (FAC, Ex. A.) The one-page report issued by Omega for this test indicates that Cooley's hair sample was "collected" on July 12, 2018. (Id.) By contrast, the FAC alleges that this hair sample was, in fact, collected on July 11, 2018. (FAC ¶ 68.)

31

Plaintiffs' opposition brief stresses this alleged discrepancy and insists that this is sufficient to plausibly allege that Omega was negligent.  (Pls.' Mem. at 2 ¶ 4.)  However, as explained earlier, Plaintiffs have not plausibly alleged that the purported administrative errors about the collection date—which Plaintiffs also raised in the state court litigation against EAC—affected the scientific integrity of the tests.  See Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7.

Additionally, the FAC does not plausibly allege that Omega acted negligently in connection with this discrepancy concerning the collection date listed on Omega's August 14 report.  Notably, the FAC does not contain any factual allegations indicating that, when Omega issued its August 14 report, Omega knew (or even should have known) that Cooley's sample was, in fact, collected by EAC on July 11 or that Omega had any reason to question whether the sample was Cooley's.  The collection of the hair sample for this test was performed by EAC, not Omega.  The FAC does not even allege what date was listed on the CCF that Cooley signed for this test and that would have been sent by EAC to Omega.[19]

Not only does the FAC fail to allege what collection date was listed on the CCF that was sent to Omega, but the FAC includes a letter in which Cooley admits that EAC reported to Omega that the collection date was July 12.  Specifically, in an October 11, 2018 letter Cooley sent to Omega, Cooley admits that the "requesting agency"—which was EAC—"reported" the collection date to Omega as July 12, 2018.  (FAC, Ex. C.)

---

[19]  Although Plaintiffs complain that they were unable to obtain a litigation package for the July 2018 hair test, Cooley would presumably know what date was listed on the CCF that she herself signed.  Notably, the FAC says nothing about the CCF for this test.

Given all the points above—even assuming that the collection of Cooley's hair sample actually occurred on July 11 and not July 12—the FAC does not plausibly allege that Omega knew (or even should have known) of that fact when it reported this test as positive.[20]

The record also contains an August 14, 2018 memorandum that EAC sent to the Family Court about the positive hair test result. This memorandum states that Cooley's hair test was "taken" on July 10, 2018. (FAC, Ex. I.) Plaintiffs seem to suggest that this EAC memorandum is proof of Omega's negligence. The FAC, however, does not allege (and the memorandum itself does not indicate) that EAC was even sent this memorandum to Omega. Moreover, Plaintiffs have not plausibly alleged that EAC's error in this memorandum—which is not even attributable to Omega—affected the scientific integrity of this drug test. See Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7.

The purported discrepancies in the collection date for Cooley's hair sample do not plausibly allege that Omega was negligent.

### iii.  Spencer's September 13, 2018 Hair Test

Spencer's September 13 hair sample was collected by LSA and Omega reported on September 18, 2018 that it had tested positive for cocaine. (Id. ¶ 79.) That same day, Spencer requested and received the "MRO Copy" of the CCF from LSA Medical. (Id. ¶ 80.) The MRO who reviewed Spencer's test worked at the same address where LSA was located. (FAC ¶ 80, Ex.)

Plaintiffs allege that the "MRO Copy" of the CCF provided by LSA establishes that the documents contained in Omega's litigation package—which includes the "Laboratory Copy of the

---

[20]  Plaintiffs appear to contend that after Omega received their October 11, 2018 letter Omega was required to either retest Cooley's hair sample or to take some other remedial action. The Court has found no authority indicating that laboratories have such a duty under New York law and the Court concludes that no such duty exists here. See Braverman v. Bendiner & Schlesinger, Inc., 121 A.D.3d 353, 360 (N.Y. App. Div. 2d Dep't 2014) (refusing to extend the scope of duty to encompass a duty to label or place a disclaimer on a report, so as to indicate that the results are to be used only for clinical purposes only); Pasternack, 27 N.Y.3d 826 (refusing to extend duty from to require laboratory to adhere to federal regulations and guidelines that do not implicate the scientific integrity of the testing process).

CCF"—were "fraudulent" and altered."   (FAC ¶¶ 107–109.)  Plaintiffs point to the fact that:

(1) the "Laboratory Copy of the CCF contains barcodes that are not found on the "MRO Copy" of

the CCF; and (2) that two sections of the MRO Copy of the CCF are blank.  Plaintiffs allege that

they know that the litigation package was fraudulent based on these purported discrepancies.  (FAC

¶¶ 106–09.)

These allegations are insufficient to plausibly allege that Omega was negligent, that these

alleged discrepancies implicated the scientific integrity of the test, or that the litigation package

Omega produced was "fraudulent" and "altered."

According to the FAC, "the medical review officer copy [of the CCF] was missing

barcodes that a medical review officer would usually scan."  (Id. ¶¶ 80-81, 106-07, Ex. G, ECF

No. 24-8, at 2.)  Plaintiffs also point out that two sections on the MRO Copy of the CCF are

blank—the "Received at Lab" section in Step 4 and the "Completed by Medical Review Officer"

section in Step 6, which has fields to indicate the MRO's conclusion about the test.  (FAC ¶¶ 106–

07, FAC, Ex. G.)  By contrast, the "Received at Lab" section in Step 4 of the "Laboratory Copy"

of the CCF is filled out and includes a signature as well as a notation indicating that that specimen

was sealed.[21]

According to the FAC, Spencer learned that the litigation package produced by Omega was

fraudulent based on the presence of the allegedly missing barcodes and the additional information

on the "Laboratory Copy" of the CCF.  (FAC ¶¶ 106–09.)  The FAC also alleges that these

documents establish that Omega "failed to fill out the laboratory chain of custody" when it received

---

[21]  The "Laboratory Copy" of the CCF does not include Step 6, which is only found on the MRO Copy of the CCF. Notably, the FAC does not allege that the "Laboratory" copies of CCF ordinarily include Step 6.

Spencer's hair specimen which violated "applicable drug testing standards and reasonable care." (FAC ¶¶ 168–69.)

Critically, however, the FAC does not allege that the MRO Copy of the CCF for Spencer's September 13 sample was ever sent to Omega. Nor does the FAC allege that Omega (or any other laboratories) is ordinarily sent the MRO Copy of the CCF or are responsible for inputting any information on the MRO copy of the CCF.[22]

Because the FAC does not allege that Omega was sent the MRO copy of this CCF (or even ordinarily receives such copies and inputs information on the MRO Copy of the CCF), the fact that the "Received at Lab" section of the MRO Copy of this CCF is blank is immaterial and is certainly insufficient to plausibly allege that Omega acted negligently or produced fraudulent documents.

Similarly, even assuming arguendo that the MRO Copy of the CCF is missing a barcode that should have been present, that would not suggest that Omega acted negligently because the FAC does not allege that the MRO Copy of the CCF was sent by LSA to Omega. Thus, Plaintiffs have not plausibly alleged that Omega was responsible for—or even aware of—the allegedly missing barcode. Accordingly, the allegedly missing barcodes do not plausibly suggest that Omega acted negligently or produced a "fraudulent" litigation package.[23]

---

[22] The Department of Transportation ("DOT") has issued comprehensive regulations that govern Transportation Workplace Drug and Alcohol Testing Programs. These regulations do not govern the various non-DOT drug tests at issue in this case. However, it is notable that the DOT regulations require the collector to send the MRO copy of the CCF directly to the MRO (and not to the laboratory, which receives a separate copy of the CCF). See 49 C.F.R. § 40.79(a)(9). Nothing in the FAC suggests that a different procedure was followed here.

[23] Plaintiffs' allegations of fraud are contradictory and non-sensical. Plaintiffs claim that the MRO copy of the CCF was missing bar codes that would "usually" be present. Plaintiffs then turn around and allege that the "Lab Copy" of the CCF for this test must be fraudulent because it contains bar codes that are not on the MRO Copy of the CCF. (FAC ¶ 106.) The record contains numerous other CCFs that contain barcodes. The presence of bar codes on the "Lab Copy' of the CCF for the September 13 test does not plausibly suggest that Omega committed fraud and fabricated the Lab Copy of the CCF.

Finally, the Court notes that the FAC also does not plausibly allege that any of the allegedly missing information on the MRO Copy of the CCF—which Plaintiffs allege were "usually" present—implicated the scientific integrity of the drug test.

First, the FAC does not allege that the MRO was sent Spencer's hair sample (or that MROs ever receive the physical samples for such tests). As such, the allegedly missing barcodes do not plausibly suggest that Spencer's actual hair sample was mishandled in some fashion or that the chain of custody for that physical specimen was broken.

Second, Plaintiffs have not plausibly alleged that the omission of the bar codes affected the scientific integrity of the testing because there was ample (and consistent) identification information on both copies of the CCF. Spencer's handwriting and signature appear on both copies of the CCF and the FAC does not deny that that he signed these documents. The Court also notes that the MRO Copy of the CCF that LSA provided to Spencer contains the same "specimen ID No. (4299122) that is found on documentation in the litigation package for this test, including on the "Laboratory Copy" of CCF and the sample pouch seal, both of which also contain Spencer's signature or initials. (Ex. M. at 8, 10.)

Third, the record includes a separate "Medical Review Officer Report" that is signed by the MRO for this test and includes various information about this test and verifies that the result was "positive." (FAC, Ex. F.)

### ii. *Spencer's September 26 Hair Test*

Spencer's September 26 hair sample was collected by Health Street and was subsequently reported as positive by Omega.

FAC alleges that Spencer knew that the "Lab Copy" of the CCF for the September 26, 2018 test was "fraudulent" and "altered" because it looks different than the CCF found in the

36

litigation package for Cooley's Augst 2018 hair test.  (FAC ¶¶ 100–02.)  The FAC also alleges that the "Lab Copy" of Spencer's CCF for his September 26 test is an "[a]bnormal on a chain of custody copy in regards of confirming identity."  (FAC ¶ 167.)  The FAC asserts that Omega was negligent for "failing to confirm the identity of Mr. Spencer" since his identity information is not found on the "Lab Copy" of the CCF.  (FAC ¶ 167.)

These allegations do not plausibly allege that Omega was negligent, that the suppression of the donor information implicated the scientific integrity of the test, or that the "Lab Copy" of the CCF produced by Omega is "fraudulent."

After Spencer received his positive test result, he requested copies of the CCF from Health Street.  On October 9, 2018, Health Street sent Plaintiff two copies of the CCF.  One copy is labeled "Lap Copy" at the bottom of the form.  The other copy states "Original Must Accompany Specimen to Laboratory" at the bottom of the form.  The litigation package for Spencer's September 26 test includes the "Lab Copy" of the CCF.

Except for Step 5, the "Original" CCF and "Lab Copy" of the CCF are identical in all respects, including the Specimen ID number at the top of the document and the collector's signature.  Step 5 on the "Original" CCF also contains information about the donor, including Spencer's name and signature.  Step 5 on the Lab Copy, however, only states "SUPPRESSED FOR LAB TESTING" and does not include that donor information.[24]

Notably, the "Lab Copy" found in the litigation package produced by Omega for the September 26 test is identical in all respects to the "Lab Copy" provided by Health Street except for:  (1) an additional barcode sticker on Omega's copy of the document, which the litigation

---

[24]  Plaintiffs point out that that the "Lab Copy" of the CCF for this test is different than the CCF found in the litigation package for Cooley's August 2018 test, which contains her name and signature in Step 5.  The CCF in Cooley's litigation package, however, is not the "Lab Copy" of CCF—rather it is the CCF which states "Original Must Accompany Specimen to Laboratory" on the bottom of the document.

package identifies as containing a unique "laboratory accession number"; and (2) Step 7 on the CCF which is entitled "Lab Received" and contains fields that Omega filled in concerning its receipt of the sample.

The specimen seal included in Omega's ligation package contains a space where Spencer initialed the seal.  Most importantly, all relevant documents contain the same Specimen ID, including the specimen seal, Omega's October 1, 2018 report with the results of the test, the "Original" copy of the CCF, and both versions of the "Lab Copy" of the CCF produced by Health Street and Omega.

The fact that the litigation package for Spencer's September 26 test contains a "Lab Copy" of the CCF for which the donor information was "suppressed" in Step 5 does not plausibly suggest that Omega was negligent or that the absence of the donor information on the CCF implicated the scientific integrity of test.  Critically, there is other identifying information—namely the same Specimen ID—on the "Lab Copy" of the CCF and every other relevant document in the record, including the specimen seal.

Notably, the litigation packages for Cooley's August 2018 test and Spencer's September 26 test both state that Omega verifies a specimen by comparing the Specimen ID number on the specimen against the Specimen ID on the CCF.  (FAC, Ex. J at 3, 4, M at 3, 4.)  The FAC does not plausibly allege that a laboratory's use of such a verification procedure is negligent.  Given Omega's reliance on that verification procedure—including for Cooley's August 2018 tests which Plaintiffs insists is accurate—the fact that "Lab Copy" of the CCF "suppressed" the donor information does not plausibly suggest that Omega was negligent or that the absence of the donor information on the CCF implicated the scientific integrity of the test.

Moreover, Plaintiffs' claims that the "Lab Copy" of the CCF produced by Omega was "fraudulent" make no sense because Health Street, which collected Plaintiffs' sample, also provided Spencer with a "Lab Copy" which similarly stated that the donor information was suppressed.

For the reasons set forth above, Plaintiffs have not plausibly alleged that Omega acted negligently in connection with Spencer's September 13 and September 26 hair tests.

### 6. Plaintiffs' Additional Arguments Do Not Plausibly Allege Negligence Concerning the July 2018 Hair Test

Plaintiffs also point to the delay between the collection of Cooley's July 2018 sample and the report of her positive result as well as the allegedly conflicting explanations they were given for the delay. Plaintiffs, however, do not plausibly allege that this delay affected the scientific integrity of the testing process. Cf. Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7. Moreover, as explained earlier, various aspects of the record indicate the implausibility of Plaintiffs' negligence claims, including the number of positive tests here as well as the fact that even Cooley's August 2018 test detected cocaine.

Plaintiffs' unsuccessful attempts to obtain litigation packages also do not plausibly allege negligence, particularly in light of the specific allegations in the FAC concerning these attempts, which the Court detailed earlier. See also Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *7.

### 7. Plaintiffs Have Not Plausibly Alleged that Spencer's September 2018 Hair Tests Proximately Cause Them Any Cognizable Harm

As set out in detail above, Plaintiffs have not alleged any plausible negligence claims concerning any of the Omega tests at issue. Plaintiffs' negligence (and related negligent infliction

of emotional distress claims) concerning Spencer's September 2018 hair tests also fail on other grounds that were not addressed above.

Plaintiffs' negligence claims concerning Spencer's September 2018 hair tests are different from the type of claims plaintiffs typically raise when alleging negligent drug testing. Usually, a plaintiff will allege that: (1) a third-party (such an employer, a court, etc.) required the plaintiff to undergo a drug test; (2) the negligence of a laboratory or collector in connection with the test caused a false positive result; and (3) the third party decided to take some adverse action against the plaintiff, such as terminating their employment, based on the allegedly false positive drug test. See, e.g., Landon, 22 N.Y.3d at 6-7; Santiago v. Greyhound Lines, Inc., 956 F. Supp. 144, 153 (N.D.N.Y. 1997). Plaintiffs' claims concerning the hair tests that were ordered by the Family Court appear to fall under this general rubric. However, Plaintiffs' claims concerning the September 13 and September 26 private hair tests are different.

Critically, the FAC does not allege that the Family Court ever learned about (or relied on) the results of Spencer's September 2018 hair tests, which Spencer voluntarily obtained at his own expense. As such, the FAC's conclusory allegation that Omega's allegedly negligent testing of Spencer's September 13 and September 18 hair samples caused him to lose his "parental rights" in Family Court is not plausible. (FAC ¶ 171.) The FAC alleges, in conclusory fashion—and without distinguishing amongst the numerous tests at issue—that the Parents lost their "parental rights" as a result of Omega's "actions." (FAC ¶¶ 171–72.) That is insufficient. The FAC does not plausibly allege that Spencer's 2018 hair texts proximately caused the Parents to lose their parental rights. In fact, the FAC does not plausibly allege that any of Plaintiffs' purported damages were caused by the September 2018 tests.

Plaintiffs' failure to plausibly allege that Spencer's September 2018 hair tests caused them any cognizable injuries is a further reason why their negligence claims concerning those tests must be dismissed.[25]

## D.  Negligent Infliction of Emotional Distress Claim

To state a claim for negligent infliction of emotional distress under New York law, a plaintiff must plausibly allege:  "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm."  Francis v. Kings Park Manor, Inc., 992 F.3d 67, 81 (2d Cir. 2021).  The causation element requires the plaintiff to plausibly allege that the mental injury was "a direct, rather than a consequential, result of the [negligence]."  Taggart v. Costabile, 131 A.D.3d 243, 253, 14 N.Y.S.3d 388 (N.Y. App. Div. 2d Dep't 2015) (quoting Kennedy v McKesson Co., 58 N.Y.2d 500, 506 (N.Y. 1983)).  The "guarantee of genuineness" requirement "may be satisfied where the particular type of negligence is recognized as providing an assurance of genuineness."  Id.  Courts, however, have recognized only a limited number of such circumstances, including "the mishandling of a corpse or the transmission of false information that a parent or child had died.  Id.; see also Ornstein v. N.Y.C. Health & Hosps. Corp., 852 N.Y.S.2d 1, 3 (N.Y. 2008) (recognizing claim where plaintiff alleged emotional distress arising from negligent exposure to HIV); see also Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000) (finding that negligently misdiagnosing a plaintiff with HIV was likely to constitute a special

---

[25]  In Spencer's related case against LabCorp concerning his August 28 hair test, Spencer's pleading includes additional allegations in an attempt to allege that LabCorp's purported negligence in connection with the August 28 positive test caused him to lose his parental rights and caused him to suffer various forms of emotional distress.  No such allegations are present in the FAC.  Moreover, for the reasons stated in the LabCorp Decision, those additional allegations fail to plausibly allege that a private hair test Spencer took proximately caused the loss of any parental rights.  And, as explained below (and in the related discussion in the LabCorp Decision), Plaintiffs are unable to plausibly allege claims for negligent infliction of emotional distress based on Spencer's private hair tests.

circumstance to allow for the recovery of purely emotional harm).  When "such specific circumstances" are absent, "the guarantee of genuineness 'generally requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety.'"  Taggart, 131 A.D.3d at 253; see Calicchio v. Sachem Cent. Sch. Dist., 185 F. Supp. 3d 303, 315 (E.D.N.Y. 2016) (dismissing claim for negligent infliction of emotional distress "given the absence of facts which plausibly assert that plaintiff's physical safety was endangered or that he plausibly feared for his physical safety").

Plaintiffs' negligent infliction of emotional distress claims fail on multiple grounds.  As discussed at length above, Plaintiffs have not plausibly alleged that Omega violated a duty "to perform [their] drug test[s] in keeping with relevant professional standards."  Landon, 22 N.Y.3d at 6-7.  Additionally, Plaintiffs' allegations—which do not involve dangers or fears of physical harm—lack the requisite guarantee of genuineness.  See Spencer, 2020 WL 7024381, at *7 (finding Spencer failed to plead the requisite "guarantee of genuineness" in claim against Psychemedics); Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *6 (dismissing Plaintiffs' negligent infliction of emotional distress claim because "the alleged conduct of the EAC defendants did not endanger the plaintiffs' safety"); Calicchio, 185 F. Supp. 3d at 315; Drake v. Laboratory Corp. of Am. Holdings, No. 02-CV-1924, 2007 WL 776818, at *5 (E.D.N.Y. Mar. 13, 2007) (dismissing negligent infliction of emotional distress claim concerning drug test where plaintiff failed to "allege that defendants' negligence resulted in a threat of physical harm, or that defendants' breach of duty endangered his physical safety").  Accordingly, Plaintiffs' negligent infliction of emotional distress claims fail.

**E. Fraud Claims**

Under New York law, to plead common law fraud, plaintiff must allege: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." Premium Mortg. Corp. v. Equifax Info. Servs., LLC, 583 F.3d 103, 108 (2d Cir. 2009) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (N.Y. 1996)).  Additionally, to establish fraudulent concealment, under New York law, a plaintiff must also allege that the defendant had a duty to disclose the material information and that it failed to do so.  P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376 (1st Dep't 2003).

Further, Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires that a party alleging fraud or fraudulent concealment "must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); see Hinds County, Miss. v. Wachovia Bank N.A., 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b).")).  To satisfy Rule 9(b), a plaintiff alleging fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004).

Here, the FAC's conclusory assertions fail to plausibly allege fraud claims, much less with the particularity required by Rule 9(b).

Plaintiffs raise various fraud and fraudulent concealment claims against Omega.  Plaintiffs generally allege that Omega's test results were all fraudulent and that Omega produced fraudulent

litigation packages for Spencer's tests and other fraudulent documentation.  Plaintiffs maintain that Omega committed fraud to cover up its allegedly negligent testing that resulted in false positive results.  Plaintiffs allege that Cori lied during the October 16 call with the Parents, and that Minno committed fraud during his October 17 call with Rambadadt and then lied on the stand during the October 25 Family Court hearing.  According to Plaintiffs, they were fraudulently induced to pay for Minno's court testimony and to purchase litigation packages.

As an initial matter, Plaintiffs' conclusory allegations that their test results and litigation packages were "fraudulent" are, given all the allegations and exhibits here, not plausible. Plaintiffs' conclusory allegations that defendants "conceal[ed] material facts that could have identified that parent plaintiffs' hair tests w[ere] falsely positive for cocaine, and . . . that would reveal that parent plaintiffs' hair follicle test failed scientific laboratory standards," (FAC ¶ 66), fail to meet the heightened pleading standards to plausibly allege fraud.  Carlucci v. Owens–Corning Fiberglas Corp., 646 F. Supp. 1486, 1489 (E.D.N.Y. 1986) ("Mere conclusory allegations of fraudulent or deceptive behavior are insufficient to satisfy Rule 9(b).").

In the prior discussion of Plaintiffs' negligence claims the Court addressed Plaintiffs' allegations and exhibits and explained why they have failed to plausibly allege that Omega's test results and documents were "fraudulent."  For example, Plaintiffs allege that they learned the litigation package for Spencer's September 13 test was fraudulent when Spencer saw that the "MRO Copy" of the CCF test for this test was missing certain information that was included on the "Lab Copy."  (FAC ¶ 107.)  However, as explained previously, Plaintiffs have not plausibly alleged that Omega was ever sent the "MRO Copy" of CCF.  Accordingly, the alleged contradictions between these two documents do not plausibly suggest fraud.

The crux of the purported fraud here are Plaintiffs' claims that the November 2017 and July 2018 hair test results are fraudulent, and that Plaintiffs were injured when the Family Court relied on these allegedly fraudulent test results. Plaintiffs also allege that defendants engaged in fraud to cover up their allegedly negligent testing. However, as explained above, Plaintiffs have not plausibly alleged that these test results were "fraudulent" or even negligently performed.

Moreover, Plaintiffs' central fraud claims also fail as a matter of law because they are premised on allegations that a third party—namely, the Family Court—relied on the alleged misrepresentations. "An essential element of any fraud . . . claim is that there must be reasonable reliance, to a party's detriment, upon the representations made." Sears Road Realty Corp. v. Exxon Mobil Corp., No. 09-CV-889, 2012 WL 4174862, at * 12 (E.D.N.Y. Sept. 18, 2012) (quoting Water Street Leasehold LLC v. Deloitte & Touche LLP, 796 N.Y.S.2d 598, 599 (N.Y. App. Div. 1st Dep't 2005) (citation omitted)). Plaintiffs have not alleged such reliance here. With respect to the Parents' court-ordered drug tests, Plaintiffs did not rely on those test results, and, in fact, objected to the Family Court's reliance on those tests. (FAC ¶¶ 30-32.) To the extent the Family Court relied on these positive drug test results, the New York Court of Appeals has held that "third-party reliance does not satisfy the reliance element of a fraud claim." Pasternack, 27 N.Y.3d at 827; see also Spencer v. Eac Network, 2021 N.Y. Misc. LEXIS 14609, at *6 (finding that the Family Court's reliance on the Parents' test results was insufficient because plaintiffs did not rely on the results); cf. Felis v. Downs Rachlin Martin PLLC, 200 Vt. 465, 476, 133 A.3d 836, 845 (Vt. 2015) (rejecting third-party reliance claim where plaintiff alleged that court in underlying action relied on purportedly fraudulent evidence submitted by opposing counsel).

Plaintiffs' other fraud claims fail for various reasons. First, Minno's testimony during the October 2018 Family Court hearing is protected by the litigation privilege. Under New York law,

"[s]tatements made by parties, attorneys, and witnesses in the course of a judicial or quasi-judicial proceeding are absolutely privileged, notwithstanding the motive with which they are made, so long as they are material and pertinent to the issue to be resolved in the proceeding." Officemax Inc. v. Cinotti, 966 F. Supp. 2d 74, 79 (E.D.N.Y. 2013) (citing Bisogno v. Borsa, 954 N.Y.S.2d 896, 896 (2d Dep't 2012)). "This immunity extends to all persons, whether governmental, expert, or lay witnesses, integral to the trial process." Storck v. Suffolk Cty. Dep't of Soc. Servs., 62 F. Supp. 2d 927, 945 (E.D.N.Y. 1999) (dismissing claims against doctors who testified about suspected child abuse in Family Court proceedings). Thus, Minno's testimony at the hearing is privileged and cannot be the basis for a fraud claim.

Second, this claim also fails on other grounds. According to the FAC, on October 17, 2018, the Parents' attorney, Robert Rambadadt, spoke with Minno after the Parents' October 16 call with Cori. The FAC alleges that during this call Minno told Rambadadt that "there's a bit of a discrepancy because Ms. Cooley was in fact negative." (FAC ¶ 138.) Plaintiffs allege that Minno committed fraud because he did not mention during this call various points about Cooley's August 2018 hair test that Minno subsequently testified about, including: (1) that the August 2018 test was "presumptively positive" for cocaine; and (2) that the July 2018 and August 2018 tests did not contradict each other due to the differences between these tests and the later collection date for the August 2018 test. (FAC ¶¶ 144–146.) This claim is meritless. Plaintiffs have not plausibly alleged that Minno had a duty to disclose this information during his call with Rambadadt. The FAC provides no details about Minno's statements to Rambadadt other than a single statement that "there's a bit of a discrepancy." That is insufficient to plausibly allege that Minno had a duty to disclose additional any additional information on this call.

Additionally, documents attached to the FAC refute Plaintiffs' fraud claims. For example, the transcript of the October 16, 2018 phone call between Cori and the Parents demonstrates that Cori informed them—before they paid for Minno to appear as a witness —about the essential information Minno would subsequently relay during his testimony at the October 25, 2018 Family Court hearing.  On this call, Cori explained that the records for Cooley's August 2018 hair test showed that it "screened positive for cocaine," but was then "confirmed" to be "just under the cutoff level" for a positive test.  (FAC, Ex. Q at 8.)  Cori told them that the August 2018 test was reported as negative because the "average quantitative value" for this 90-day sample was "under 500" which was the "cutoff level" for a positive test.  (Id. at 9.)  While Cooley insisted that the negative result from the August 2018 test "contradicts" the July 2018 test, Cori explained to the Parents that the August 2018 test was based on the "average of the hair" in the full 90-day sample whereas the July 2018 hair test—which analyzed three different hair segments—had "quant values [that] were going down over the 90 day timeframe."  (Id. at 7.)  Cori also pointed out that the most recent 30-day hair segment for the July 2018 test was 531 pg/mg, which was right above the 500 pg/mg cutoff for a positive test.  (Id. at 7.)

Similarly, to the extent that Plaintiffs allege that they were defrauded into purchasing the litigation package for Cooley's August 2018 test, Cori disclosed the essential information contained in the litigation package during his call.  Cori told them that if they ordered a litigation package for Cooley's August 2018 test, the "court will see there was cocaine."  (Id. at 10.)  He also told them that the initial screening test for this sample was positive, which is reflected in the litigation package.

Plaintiffs also allege that Cori made other alleged misrepresentations during the October 16 call concerning the purported reasons why the positive result for Cooley's July 2018 test was

47

not reported by Omega until August 14.  (FAC ¶ 124.)  These claims also fail because, inter alia, Plaintiffs have not plausibly alleged that they relied on these alleged misrepresentations or were injured by them.  At the end of this call, Spencer told Cori he was "making it up," that Cori and other Omega employees "lied" when they "said the court system was down," that Cori's explanation for the delay "does not make sense" and is "impossible," and that Omega would be hearing from the Parents' attorney.  (FAC, Ex. Q.)  Those statements make clear that the Parents did not believe or rely on Cori's statements.  Moreover, the FAC does not allege what actions that the Parents took in purported reliance on these alleged misrepresentations or how these misrepresentations were a proximate cause of any alleged injuries.

Plaintiffs have also not plausibly alleged that Cori's alleged misrepresentations were the proximate cause of any of their alleged injuries.  On October 15—before the Parents even spoke with Cori—the Family Court requested that they take hair tests and they refused.  Then, after speaking with Cori, they continued to refuse to take additional hair tests.  Rather than taking advantage of these opportunities to establish that they were not using cocaine—which the Parents insist was the case—the Parents refused to take additional tests.  (Cf. LabCorp Decision at 23–25 (discussing proximate cause).)

To the extent Plaintiffs allege that Defendants made misrepresentations that induced them to purchase the litigation packages for Spencer's private tests through Omega, the FAC does not plausibly allege any such claims.  The FAC does not identify any specific misrepresentations that allegedly induced Spencer to purchase these two litigation packages.  Spencer has also not plausibly alleged that these litigation packages were fraudulent.  Plaintiffs' claims that these litigation packages are "fraudulent" are based on alleged discrepancies in certain documents which, as explained earlier, are insufficient to plausibly allege fraud or even negligence by Omega.

Additionally, the FAC does not allege that Plaintiffs relied, to their detriment, on Spencer's private hair tests or the litigation packages for those tests.  Plaintiffs admit that they never submitted Spencer's September 2018 hair tests to the Family Court.  Additionally, Spencer insists that he knew from the outset that these reports and litigation packages were false and incorrect because he never used drugs, (FAC ¶ 114).  See Spencer, 2020 WL 7024381, at *5 ("Plaintiff cannot show that he reasonably relied on this drug test because, according to the allegations in the complaint, plaintiff must have known that the results of this test were incorrect when he received them.").  Accordingly, plaintiffs fail to allege reasonable reliance as required to plead a fraud claim.

In sum, Plaintiffs fail to plead sufficient facts to allege claims for fraud or fraudulent concealment.  Accordingly, plaintiffs' fraud claims are dismissed.

## F. Leave to Amend

"A pro se plaintiff should ordinarily be given the opportunity 'to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.'"[26] Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795–96 (2d Cir. 1999) (internal quotation marks omitted)).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  "Where it appears that granting leave to amend is unlikely to be productive,

---

[26]  As noted previously, given that Plaintiffs were represented at various points during this litigation, including at the time they filed the FAC, it is not clear that Plaintiffs are entitled to the solicitude ordinarily afforded pro se litigants. However, even assuming that such solicitude is warranted is here, the Court would still deny Plaintiffs leave to amend.

. . . it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).

While amendments to pro se complaints are generally granted "fairly freely," even pro se litigants are not entitled to unlimited opportunities to amend their pleadings. Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir. 1980) (citation omitted); Best v. City of N.Y., No. 12-CV-7874, 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018) (quotation marks omitted).

The Court has carefully considered whether leave to amend is warranted here. The FAC does not suggest that valid claims might be stated by Plaintiffs. Additionally, Plaintiffs have already filed an amended complaint and were also already granted an opportunity to further amend the complaint, which they did not pursue. (ECF No. 36.) Plaintiffs have filed five lawsuits stemming from the drug tests connected to the Family Court proceeding and have had ample opportunities to allege plausible claims. Given all of the above, the Court denies leave to amend.

### III.  CONCLUSION

For the reasons stated above, the Court grants Defendants' motion and dismisses the FAC with prejudice.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, should Plaintiffs seek in forma pauperis status for the purpose of an appeal, any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to close this case and to mail a copy of this order to the pro

se Plaintiffs.

**SO ORDERED.**

_____/s/(JMA)_____

Dated:  August 6, 2024                               Joan M. Azrack
Central Islip, New York                              United States District Judge